United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 2, 2004**

Charles R. Fulbruge III
Clerk

REVISED NOVEMBER 30, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-40655
_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

RICHARD HICKS

Defendant - Appellant

_____

Appeal from the United States District Court for the
Eastern District of Texas, Sherman
_____

Before KING, Chief Judge, and SMITH and EMILIO M. GARZA, Circuit
Judges.

KING, Chief Judge:

Richard Hicks, a federal prisoner, appeals his conviction
and sentence for violating 18 U.S.C. § 922(g)(8) by possessing
firearms and ammunition while he was subject to a domestic
restraining order. He alleges that the district court improperly
admitted evidence and testimony at trial, improperly sentenced
him, and incorrectly concluded that his challenge to the
underlying protective order was barred by Fifth Circuit
precedent. He also contends that the evidence against him was
insufficient for a conviction. For the following reasons, we

1

AFFIRM Hicks's conviction and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 25, 2000, Officers Michael Webster and James Lamance of the Bells Police Department observed Richard Hicks leave the Dusty Saddle, a local bar in Whitewright, Texas, in a white pickup truck. While driving away from the Dusty Saddle, Hicks crossed the road's centerline. The officers activated their emergency lights and tried to pull him over. In response, Hicks pulled away, ran two stop signs, and led the officers on a high-speed chase that ended in a field. At the field, the officers' vehicles got stuck, and they could not continue pursuing Hicks.

Approximately one month later, on December 20, 2000, a white pickup truck driven by Hicks led Officer Kevin Lamance and his brother, Officer James Lamance, on a high-speed chase. The officers had observed Hicks's truck leaving the Dusty Saddle and swerving on the road, and they had activated the overhead lights of their patrol vehicle in an attempt to stop him. Instead of stopping, however, Hicks accelerated and engaged the officers in a pursuit that ended in the same field where the November chase ended. During this chase, Hicks's truck hit a bridge and slammed into the opposite shoulder of the road. Because Officer James Lamance's vehicle had become stuck in the same field a month before, the officers chose not enter the field. Later, they located the damaged truck at Hicks's residence. Approximately

2

three days after this chase, on or about December 22, 2000, Hicks purchased a new white pickup truck.

On December 23, 2000, at around 1:00 a.m., Officers James and Kevin Lamance spotted and followed a newer-model white pickup truck leaving the Dusty Saddle. The truck was traveling at a high rate of speed and appeared incapable of remaining in its lane. The officers activated their overhead lights, but instead of stopping, the truck accelerated. The truck then turned into the same field where the November 25 and December 20 chases had ended. Because the officers' patrol vehicle was not equipped with four-wheel drive, they once again chose not to enter the field. Based on Hicks's history of leading officers on similar chases, the officers radioed that the driver they were pursuing was likely Hicks. Eventually, the white truck stopped in the field approximately 200 yards from the patrol car.

After the truck stopped in the field, Officer Kevin Lamance heard and felt a bullet whiz by his head. Officer James Lamance immediately radioed that shots had been fired. Shortly thereafter, Officer Kevin Lamance heard another shot, felt the patrol car begin to roll forward, and realized that his brother, who was driving, had been shot. Officer Kevin Lamance exited the vehicle and returned fire. The pickup truck then left the field, and Officer Kevin Lamance radioed that an officer was down. His brother, Officer James Lamance, died from a gunshot wound to the head.

3

Officer Kevin Lamance did not clearly see who was driving the white truck the night his brother was killed. He believed, however, that Hicks was at the wheel given the similarities to the other two chases in which Hicks had engaged the police. Additionally, Fannin County Deputy Sheriff Matt Robbins had heard Officer James Lamance's radio transmissions about the white pickup truck on December 23, 2000 and had headed to the scene of the chase to render assistance. While en route to the scene, Officer James Lamance advised him by radio that Hicks was probably the driver. As Deputy Robbins approached the scene of the shooting, he saw a pickup truck that matched the description given by Officer James Lamance entering a nearby intersection. Robbins continued driving with the pickup truck traveling behind him, and eventually the truck pulled into the private drive to Hicks's residence and entered the garage. Although Robbins followed the truck to Hicks's house, he did not get a good look at the driver and could not say for sure that it was Hicks.

Immediately following the shooting, Hicks's house was placed under surveillance. Later that evening, a SWAT team from a nearby county arrived and, after unsuccessfully trying to contact Hicks, forcibly entered the house and arrested him.

During Hicks's arrest, officers observed a .30-30 rifle on a gun rack in Hicks's son's room. This rifle was not in the same position as the other three firearms on the rack and looked to the officers as though it had been quickly thrown into place.

4

Subsequently, the officers obtained a search warrant for Hicks's home.  When they searched his house, they seized, among other things, the .30-30 rifle.  They also found .30-30 shell casings in the field where Officer James Lamance was shot.  John Beene, a criminalist with the Texas Department of Public Safety, performed ballistics tests on the shell casings and the rifle, and he concluded that the shell casings found at the scene of the shooting were fired from the .30-30 rifle found in Hicks's house.

Hicks was tried in state court for the capital murder of Officer James Lamance.  A jury found him not guilty of capital murder and related offenses.  On October 10, 2002, a federal grand jury sitting in Sherman, Texas returned an eight-count indictment against Hicks for possessing firearms and ammunition while he was subject to a domestic restraining order, in violation of 18 U.S.C. § 922(g)(8).  Hicks was subject to a domestic restraining order at the time of the shooting as a result of an incident in which he fired gunshots at his ex-wife's home in Bonham, Texas.  The restraining order, which his ex-wife obtained on April 25, 2000, was valid for a period of two years and prohibited Hicks from possessing either firearms or ammunition.

On November 14, 2002, Hicks filed four pre-trial motions in federal district court: (1) a motion to suppress evidence; (2) a motion to dismiss the indictment; (3) a motion to exclude the testimony of John Beene, the government's ballistics expert; and

(4) a motion in limine to exclude evidence of Officer James Lamance's death.  On December 17, 2002, Hicks filed a supplemental motion to dismiss the indictment, in which he stated new grounds for dismissal, including a collateral attack on the validity of the underlying protective order.  Subsequently, the district court denied Hicks's motions to dismiss, motion to exclude the expert testimony of John Beene, and motion to suppress.  Immediately before trial, Hicks once again attempted to limit the admission of evidence regarding Officer Lamance's death on relevancy grounds.  In response to this request, the district court limited the government's use of its evidence relating to Officer Lamance and decided to instruct the jury that Hicks had been found not guilty of murder in state court.

On January 14, 2003, after approximately three hours of deliberation, the jury found Hicks guilty on all eight counts. On February 3, 2003, Hicks moved for a new trial and judgment of acquittal.  The district court denied both requests.

The district court then conducted a two-day sentencing hearing where both the government and Hicks presented evidence about the cause of Office Lamance's death.  At the end of the hearing, the district court found that Hicks killed Officer Lamance and, accordingly, the court applied United States Sentencing Guideline ("U.S.S.G.") § 2K2.1(c)(1)(B)'s homicide cross-reference provision, finding that Hicks's conduct was most analogous to second-degree murder.  The district court then

6

downwardly departed, arriving at a total sentence of 180 months. Specifically, the court sentenced Hicks to 120 months' incarceration for count one, sixty of which were to be served consecutively to the sentence for counts two through eight (120 months per count to be served concurrently). Hicks also received eight concurrent three-year terms of supervised release and an $800 special assessment.

The district court entered its judgment on May 2, 2003. Hicks filed a notice of appeal the same day. In his appeal, Hicks claims that the district court erred by: (1) admitting evidence of Officer James Lamance's death; (2) allowing John Beene, the government's ballistics expert, to testify at trial; (3) denying Hicks's motion to suppress evidence; (4) applying the Sentencing Guideline's second-degree murder guideline at sentencing; (5) sentencing Hicks to consecutive sentences; (6) failing to find that the evidence was insufficient for a conviction; and (7) finding that Hicks's challenge to the validity of the underlying protective order was barred by Fifth Circuit precedent. Below, the court addresses each of Hicks's allegations in turn.

## II. EVIDENCE OF OFFICER JAMES LAMANCE'S DEATH

Hicks begins by alleging that the district court erred by (1) allowing the government to introduce evidence of Officer

7

James Lamance's death while (2) preventing Hicks from introducing evidence that he was not responsible for Officer Lamance's death.[1]

This court reviews a district court's evidentiary decisions for an abuse of discretion. United States v. Pace, 10 F.3d 1106, 1115 (5th Cir. 1993). Even where the district court erroneously admitted prejudicial evidence, the defendant's conviction will not be reversed if the error was harmless. See id. at 1116.

Hicks first contends that the district court should not have allowed the government to introduce evidence of Officer James Lamance's death at trial. According to Hicks, this evidence should have been excluded under FED. R. EVID. 402 as irrelevant and under FED. R. EVID. 403 as substantially more prejudicial than probative. Hicks also contends that the district court's limiting instruction, which cautioned the jury that Hicks was not on trial for murder and had been previously acquitted of murder in state court, was insufficient to cure the prejudicial admission of this evidence.[2]

---

[1] Hicks addresses these issues separately in his appellate brief. For the ease of discussion, the court considers them together.

[2] The district court gave the jury the following limiting instruction:

> Members of the jury, the Defendant is not on trial in this case for murdering anyone. He was charged in a state court with having done so and he was found not guilty. This testimony that you are now hearing is admitted for the purpose of considering, your

8

When confronted with potentially prejudicial evidence, a trial court must conduct a balancing test under FED. R. EVID. 403 to determine whether the probative value of the evidence is outweighed by its undue prejudicial effect. United States v. Alarcon, 261 F.3d 416, 424 (5th Cir. 2001). Speaking generally about the admission of "other acts" evidence--such as the evidence in question suggesting that Hicks murdered Officer Lamance--this court has stated:

> One of the dangers inherent in the admission of "other acts" evidence is that the jury might convict the defendant "not for the offense charged but for the extrinsic offense." This danger is particularly great where . . . the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged.

United States v. Ridlehuber, 11 F.3d 516, 521 (5th Cir. 1993) (citations and internal quotation marks omitted). While "other acts" evidence can be prejudicial, here it is unclear how the admission of evidence regarding Officer Lamance's death would prejudice Hicks. Based on the evidence presented at trial, the jury could not have concluded that Hicks was responsible for Officer Lamance's death unless it also concluded that he possessed the ammunition in question. Thus, the traditional rationale for excluding "other acts" evidence--that if the jury was led to believe that the defendant committed one bad act, it

---

consideration insofar as you deem it relevant, as to whether or not the Defendant possessed two live cartridges on the morning of [December 23, 2000].

9

might unfairly find that he committed another separate bad act--is inapplicable to this case. Additionally, the admission of evidence regarding Officer Lamance's death was reasonably necessary for the jury to understand why Officer Lamance was not available to testify. The evidence was, therefore, relevant, and the district court did not abuse its discretion by concluding that its probative value was not substantially outweighed by the danger of unfair prejudice. Furthermore, the district court did not abuse its discretion by giving the jury a limiting instruction regarding this evidence. See United States v. Sprick, 233 F.3d 845, 856 (5th Cir. 2000) (holding that in order to mitigate any unfair prejudice, a trial court may give a limiting instruction).

Even if the district court did err when it admitted evidence regarding Officer Lamance's death--something this court does not conclude--we still would not reverse Hicks's conviction because ample other evidence was introduced from which the jury could conclude that Hicks possessed two live rounds of .30-30 ammunition on the night in question, thereby making the error harmless.[3]

---

[3] This evidence includes, inter alia: (1) Hicks's past pattern of high-speed chases leading from the Dusty Saddle to the field where the shots were fired; (2) Hicks's recent purchase of a new white pickup truck and the fact that the truck from which the shots were fired was also new and white; (3) Deputy Robbins's testimony that he followed a white truck from the road adjacent to the scene of the shooting to Hicks's garage; (4) the ballistics expert's testimony that the .30-30 casings found in

10

Hicks fares no better when arguing that the district court erred by not permitting him to introduce expert evidence that he did not kill Officer Lamance because Lamance was shot by a handgun rather than by a .30-30 rifle. Because Hicks presents no proof that he attempted to offer this evidence at trial or that the district court made it known that it would not revisit the question of whether this evidence was admissible, Hicks has failed to preserve this issue for appeal and the plain error standard of review applies. See United States v. Jimenez, 256 F.3d 330, 342-43 (5th Cir. 2001) ("Objecting to an in limine order excluding testimony or evidence does not relieve a party from making an offer of proof [at trial] . . . [unless] the trial court makes clear that it does not wish to hear further argument on the issue."). Hicks has pointed to no error whatsoever committed by the district court when it ruled that Hicks's evidence was inadmissable. Moreover, there was a good reason for excluding this evidence: admitting it could have confused the issues before the jury by focusing its attention on whether Officer Lamance died from shots fired from the truck or from friendly fire, an issue irrelevant to the question of whether Hicks possessed a gun and live .30-30 ammunition on the night in question. Accordingly, the district court did not err by

the field were fired from the gun seized in Hicks's son's bedroom; and (5) the fact that Hicks was alone inside his house after the truck entered the garage.

11

excluding this evidence.

### III. THE TESTIMONY OF BALLISTICS EXPERT JOHN BEENE

Hicks next contends that the district court abused its discretion by admitting, over his pre-trial and trial objections, the testimony of the government's ballistics expert, John Beene. Hicks asserts that Beene's testimony--concluding that the bullet casings in the field were fired from the .30-30 rifle found in Hicks's son's bedroom--should have been excluded under FED. R. EVID. 702 because Beene was not qualified to render an expert opinion on shell casing comparisons. Further, Hicks claims that the government failed to demonstrate that the method Beene employed when comparing the casings met the criteria for reliability set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).[4]

This court reviews a district court's decision to admit expert testimony under an abuse-of-discretion standard. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999) ("[This] standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion."). "If we find an abuse of discretion in admitting the evidence, we consider any error under the harmless error doctrine, affirming the judgment unless the ruling affected a substantial right of

---

[4]     Hicks argues in separate sections of his appellate brief that (1) Beene was unqualified to render an expert opinion and (2) Beene's methodology was unreliable.  The court will discuss these related issues together.

the complaining party." United States v. Norris, 217 F.3d 262, 268 (5th Cir. 2000).

Hicks argues that John Beene's shell casing comparison technique did not meet the criteria for reliability set forth in Daubert for several reasons. First, he contends that Beene could not say: (1) if the technique had ever been empirically tested; (2) if the technique had been published in a peer-reviewed article; (3) if any studies have been performed to calculate the rate of error for the technique; and (4) if any standards exist for making shell-casing-to-firearm comparisons.[5] Hicks also notes that Beene admitted that he had read articles and heard presentations critiquing shell casing comparisons precisely because no objective standards or criteria exist for making matches. Moreover, Hicks argues that Beene's application of the casing comparison technique in this case was particularly unreliable because Beene could not remember (even when looking at his notes) how many marks he used to make the match, how wide or deep the markings were, and precisely where the marks were located on the casings. Additionally, Hicks notes that Beene admitted that he did not test-fire other .30-30 rifles to exclude markings that were not unique to the rifle found at Hicks's

_____

[5]     Hicks originally raised these issues at the state-court Daubert hearing during his trial for Officer Lamance's murder. The district court based its decision to admit Beene's expert testimony on the evidence presented at this state-court Daubert hearing.

13

house.  Finally, Hicks challenges Beene's qualifications, alleging that Beene was not qualified as an expert to testify that shell casings discovered at the crime scene were fired from the rifle found at Hicks's home.

As for Hicks's challenge to Beene's qualifications as a ballistics expert, there was more than ample evidence to permit the district court to find that he is a qualified ballistics expert.  This court has held that "[t]o qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" United States v. Bourgeois, 950 F.2d 980, 987 (5th Cir. 1992) (second alteration in original) (quoting United States v. Johnson, 575 F.2d 1347, 1361 (5th Cir. 1978)).  Additionally, FED. R. EVID. 702 states that an expert may be qualified based on "knowledge, skill, experience, training, or education . . . ." See also Kuhmo Tire Co., 526 U.S. at 151 (discussing witnesses whose expertise is based purely on experience).  At the state-court Daubert hearing, Beene testified that he had a degree in chemistry, had received training in firearms comparisons testing from the FBI, and had done firearms examinations for over twenty years.  At Hicks's trial in federal court, Beene repeated most of these claims, adding that he had performed more than a thousand cartridge-firearm comparisons in the course of his twenty-eight-year career with the Texas Department of Public Safety without a

14

suggestion that any of his matches were incorrect.  Based on Beene's training, twenty-eight years of experience, and numerous prior cartridge comparisons, the district court did not abuse its discretion in allowing him to testify as an expert at trial.

Turning to Hicks's attack on the reliability of Beene's methodology, the court notes that under FED. R. EVID. 702, expert testimony is permissible if the district court finds, pursuant to Rule 104(a), that the expert is testifying to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact issue.  Daubert, 509 U.S. at 592.  "Under Daubert, Rule 702 charges trial courts to act as 'gate-keepers,' [and to] mak[e] a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'"  Pipitone v. Biomatrix, Inc., 288 F.3d 239, 243-44 (5th Cir. 2002) (quoting Daubert, 509 U.S. at 592-93).

In Daubert, the Supreme Court announced several factors that courts should consider when exercising their gate-keeping function, including: (1) whether the technique in question has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the error rate of the technique; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique has been generally accepted in the scientific community.  Daubert, 509

15

U.S. at 593-94.  The proponent of expert testimony--here, the government--has the burden of showing that the testimony is reliable.  See Moore v. Ashland Chem. Inc., 151 F.3d 269, 276 (5th Cir. 1998) (en banc).  To show that expert testimony is reliable, however, the government need not satisfy each Daubert factor.  As the Supreme Court has stated, the test of reliability "is 'flexible,' and Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." Kumho Tire Co., 526 U.S. at 141 (emphasis in original). Reaffirming the latitude given to trial judges to determine reliability, the Supreme Court further stated in Kumho Tire that "whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine."  Id. at 153.

In support of his claim that Beene's methodology is unreliable, Hicks invites the court's attention to Sexton v. Texas, 93 S.W.3d 96 (Tex. Crim. App. 2002).  Sexton, however, is inapposite.  In Sexton, the Texas Court of Criminal Appeals assessed the reliability of the technique of using magazine markings to connect spent shell casings found at a crime scene with live shell casings found at another location.  The expert in

16

Sexton had testified that certain spent shell casings and live shell casings had at one time been in the same magazine or magazines because they had similar magazine marks; however, the magazines that allegedly made those marks were never found. Similarly, the gun used to shoot the spent shell casings was never found. The Texas Court of Criminal Appeals held that the expert's methodology was not proven to be reliable given that the absence of the magazines rendered the expert unable to make test marks for comparison. Id. at 101. Hicks's case is wholly distinguishable from Sexton because the .30-30 rifle suspected of having produced the spent shell casings was available and was used for purposes of comparison testing.

Moreover, the matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades. See United States v. Washington, 550 F.2d 320, 324 (5th Cir. 1977) ("firearms expert testified that the shell casing found in the trunk of the Mercury Comet had been fired from the pistol 'to the exclusion of all other weapons in existence'"); see also United States v. Lopez-Escobar, 920 F.2d 1241, 1243 (5th Cir. 1991) (observing that the district court directed the prosecutor to arrange a comparison of a casing found near the scene of the arrest and casings to be test-fired from a specific gun). We have not been pointed to a single case in this or any other circuit suggesting that the methodology employed by Beene is unreliable.

17

Additionally, standards controlling firearms comparison testing exist.  As Beene testified at the state-court <u>Daubert</u> hearing, he followed well-accepted methods and scientific procedures in making his comparisons.  He also testified in federal court that the Association of Firearm and Tool Mark Examiners produces literature about firearms comparison testing that he relied on and that is authoritative in the field of firearms and tool mark examination.  Further buttressing the reliability of his methodology, Beene also testified at the state-court <u>Daubert</u> hearing that the error rate of firearms comparison testing is zero or near zero.

Based on the widespread acceptance of firearms comparison testing, the existence of standards governing such testing, and Beene's testimony about the negligible rate of error for comparison tests, the district court had sufficient evidence to find that Beene's methodology was reliable.  Accordingly, it did not abuse its discretion by admitting his testimony.

## IV. HICKS'S MOTION TO SUPPRESS EVIDENCE

Hicks next argues that the district court erred by denying his motion to suppress.  In his motion to suppress, Hicks claimed that the police seized evidence, including the .30-30 rifle, from his house in the absence of either a warrant or exigent circumstances.  Based on a transcript of testimony presented at the state-court suppression hearing (when Hicks was tried for

18

Officer Lamance's murder), the district court denied Hicks's motion to suppress, concluding that exigent circumstances justified the warrantless entry into Hicks's home that led to the seizure of the evidence. Hicks now claims that the district court reached this conclusion in error.

When a defendant challenges the denial of a motion to suppress, this court reviews the district court's findings of fact for clear error and its conclusions of law de novo. United States v. Williams, 365 F.3d 399, 403 (5th Cir. 2004) (per curiam). Under the Fourth Amendment, it is "presumptively unreasonable" for law enforcement officers to enter a suspect's home in order to arrest him without a warrant. Payton v. New York, 445 U.S. 573, 586 (1980). "[T]he presence of exigent circumstances may justify a warrantless entry into a home for the purposes of arrest," however, if there is probable cause to believe the suspect has committed a crime.[6] United States v. Vasquez, 953 F.2d 176, 179 (5th Cir. 1992). Because the determination of whether exigent circumstances exist is highly fact-specific, this court will not reverse a district court's finding of exigency unless it is clearly erroneous. Id.[7]

---

[6] Hicks does not appeal the district court's probable cause determination. Hence, this court will only consider his challenge to the district court's finding that exigent circumstances existed.

[7] In Tamez v. City of San Marcos, 118 F.3d 1085, 1094 (5th Cir. 1997), a panel of this court adopted a bipartite standard of review for exigency: first, it examined the district

19

According to Hicks, the police violated his Fourth Amendment rights by engaging a SWAT team to enter his home to arrest him in the absence of either an arrest warrant or exigent circumstances. Additionally, based on his allegation that the firearms the police officers observed through a window of his home were made visible by the SWAT team's actions during his arrest,[8] he contends that the subsequent search warrant, which was based on the SWAT team's observations, was invalid. Thus, he argues that the evidence seized from his house pursuant to the search warrant, including the .30-30 rifle, should have been suppressed as the fruits of a poisonous tree. In support of these claims, Hicks contends that the district court's finding of exigency was erroneous, especially in light of the fact that the SWAT team waited nearly five hours from the time that the police arrived at his home until it entered his house and arrested him. According to Hicks, nothing happened during these five hours, and the police could easily have used this time to obtain a warrant.

court's underlying factual findings for clear error; second, it examined the district court's ultimate determination of exigency de novo. Vasquez, however, was decided before Tamez and has been regularly followed in this circuit. See, e.g., United States v. Rodea, 102 F.3d 1401, 1404 (5th Cir. 1996) (applying the standard of review found in Vasquez). Accordingly, this court will use the clearly erroneous standard of review found in Vasquez.

[8] Hicks does not explain this theory on appeal. In his motion to suppress, he contended that the SWAT team shot a hole in the window of his son's bedroom where several shotguns were stored in a gun rack. He further claimed that the officer whose affidavit was used to obtain the search warrant was only able to view these firearms by peering through this hole in the window.

20

In this circuit, exigent circumstances exist when the "societal costs of obtaining a warrant . . . outweigh the reasons for prior recourse to a neutral magistrate." United States v. Rodea, 102 F.3d 1401, 1404 (5th Cir. 1996) (quoting Arkansas v. Sanders, 442 U.S. 753, 759 (1979)). Accordingly, this court has held that "[e]xigent circumstances include those in which officers reasonably fear for their safety, where firearms are present, or where there is a risk of a criminal suspect's escaping or fear of destruction of evidence." United States v. Rico, 51 F.3d 495, 501 (5th Cir. 1995).

Based on this circuit's understanding of when exigent circumstances exist, the district court did not clearly err in finding that exigent circumstances justified the SWAT team's warrantless entry into Hicks's home. First and foremost, the officers were confronted with a suspect who they believed had just shot and killed a fellow police officer. See Welsh v. Wisconsin, 466 U.S. 740, 753 (1984) (holding that "an important factor to be considered when determining whether any exigency exists is the gravity of the underlying offense for which the arrest is being made"). Moreover, the officers reasonably believed that Hicks was armed and dangerous. See Rico, 51 F.3d at 501 (holding that the presence of firearms is a factor militating in favor of a finding of exigency). The officers also had reason to believe that Hicks had gone to great lengths in the past to avoid capture. Likewise, although the officers had

21

information that Hicks was likely alone in the home, they did not know for certain whether there were any other persons inside. Finally, Hicks's characterization of the stand-off as simply a five-hour period where nothing happened is disingenuous. In fact, the record shows that the SWAT team organizer was notified at 2:00 a.m. that the team was needed. Once the team was assembled at the sheriff's office and all of the relevant equipment was gathered, it left for Hicks's home at approximately 3:45 or 4:00 a.m. The team then formulated its plan of action, and it conducted visual, aerial, and thermal surveillance to determine the least-risky way of entering Hicks's home. Finally, it fired tear gas and pepper spray into Hicks's home and, after this did not work, it entered the home. In light of the fact that the police believed that Hicks was armed, had just killed a police officer, and did not want to be captured, exigent circumstances existed and the SWAT team had no reason to delay entry into Hicks's house once it was ready to act. See Warden v. Hayden, 387 U.S. 294, 298-99 (1967) ("The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."); Rico, 51 F.3d at 501. Accordingly, the district court did not err when it found that exigent circumstances justified the SWAT team's entry into Hicks's home.

Hicks similarly fails in arguing that observations made by the SWAT team during and after its warrantless entry into his

22

house were improperly used as the basis for a subsequent search warrant. According to Hicks, the judge who issued the search warrant should not have relied on these observations to support a finding of probable cause because they were obtained during an illegal search. As discussed above, however, exigent circumstances justified the SWAT team's warrantless entry into Hicks's house, and the guns inside Hicks's house were in plain view during the SWAT team's protective sweep of the house incident to Hicks's arrest. See Maryland v. Buie, 494 U.S. 325, 327 (1990) (defining a "protective sweep" as "a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others"). The observations in question were not, therefore, made during an illegal search. Accordingly, Hicks has shown no error on the part of the district court in denying his motion to suppress.

## V. APPLICATION OF THE SECOND-DEGREE MURDER GUIDELINE

Hicks next contends that the district court erred at sentencing when it overruled his objection to the use of U.S.S.G. § 2A1.2, the second-degree murder guideline, to increase his offense level. Specifically, Hicks alleges that the district court erred by: (1) using the second-degree murder guideline instead of the manslaughter guideline; and (2) applying the second-degree murder guideline without first requiring proof beyond a reasonable doubt that Hicks committed second-degree

23

murder.[9]

This court reviews a district court's factual findings during sentencing for clear error and its interpretation of the Sentencing Guidelines, including its application of the cross-reference provisions of § 2K2.1(c), de novo. See United States v. Levario-Quiroz, 161 F.3d 903, 905 (5th Cir. 1998). "A sentence will be upheld unless it was imposed in violation of law, was an incorrect application of the sentencing guidelines, or is outside the range of the applicable sentencing guideline." United States v. Ocana, 204 F.3d 585, 588 (5th Cir. 2000).

Hicks contends that the district court improperly applied U.S.S.G. § 2K2.1(c)(1)(B)'s cross-reference provision when it used the guideline for second-degree murder (U.S.S.G. § 2A1.2) rather than the guideline for involuntary manslaughter (U.S.S.G. § 2A1.4) to determine his offense level. Under U.S.S.G. § 2K2.1, which applies to federal firearms offenses, "[i]f the defendant used or possessed any firearm or ammunition in connection with the commission . . . of another offense [and] . . . if death resulted," a district court should apply "the most analogous [homicide] offense guideline" to determine the defendant's base offense level, provided that the resulting offense level is greater than the otherwise-applicable level under § 2K2.1.

---

[9]    Hicks raises these issues separately in his appellate brief.  The court considers them together for the ease of discussion.

24

U.S.S.G. § 2K2.1(c)(1)(B) (2002). After conducting a hearing on the question of Hicks's involvement in Officer Lamance's death, the district court found that Officer Lamance was killed by a .30-30 round fired by the driver of the white pickup truck that the police had chased. Because the jury had previously concluded, beyond a reasonable doubt, that Hicks was the driver in question, the district court found that Hicks killed Officer Lamance. Specifically, the court concluded that Hicks saw the light bar on top of Officer Lamance's patrol car and shot at it, killing him. The court then found that Hicks's conduct was more analogous to second-degree murder than to involuntary manslaughter, and it calculated Hicks's base offense level under the second-degree murder guideline (U.S.S.G. § 2A1.2). According to Hicks, the district court erred by using this guideline.

Hicks contends that the district court erred by applying U.S.S.G. § 2A1.2 for two reasons. First, he asserts that, in light of the evidence presented at trial and in the sentencing hearing, the "most analogous" offense to what he allegedly committed was involuntary manslaughter, an offense that has a significantly lower base offense level than second-degree murder. Second, he argues that the district court erred by not requiring the government to demonstrate beyond a reasonable doubt that he caused Officer Lamance's death. Hicks alleges that this failure led to a violation of his due process rights. He also claims

that the district court should have used the beyond-a-reasonable-doubt standard because he had been previously acquitted of murder in state court.  Finally, Hicks buttresses these arguments in a supplemental brief by referencing <u>Blakely v. Washington</u>, 124 S.Ct. 2531 (2004), which he claims stands for the propositions that, under the Sentencing Guidelines: (1) a sentence cannot be enhanced on the basis of a fact not alleged in the indictment; and (2) any fact used to increase a sentence should be submitted to the jury and proven beyond a reasonable doubt.  Since the federal jury did not find that Hicks killed Officer Lamance, he argues that the district court's use of the second-degree murder guideline (based solely on its finding that Hicks killed Officer Lamance) was improper in light of <u>Blakely</u>.

The court first turns to Hicks's claim that the district court erred when it computed his sentence using the second-degree murder guideline (U.S.S.G. § 2A1.2) rather than the involuntary manslaughter guideline (U.S.S.G. § 2A1.4).  In applying the cross-reference provisions of U.S.S.G. § 2K2.1(c), the district court was required to determine what federal homicide offense was most analogous to the conduct it found that Hicks had committed. <u>Cf.</u> <u>United States v. Perez</u>, 897 F.2d 751, 753 n.2 (5th Cir. 1990) (discussing a prior version of U.S.S.G. § 2K2.1(c)(1)).  Under federal law, the distinction between second-degree murder and involuntary manslaughter turns on whether the defendant committed

the killing with "malice" or with a reduced level of culpability. See United States v. Browner, 889 F.2d 549, 551-52 (5th Cir. 1989). Second-degree murder is defined as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a) (2000). Malice aforethought "encompasses three distinct mental states: (1) intent to kill; (2) intent to do serious bodily injury; and (3) extreme recklessness and wanton disregard for human life ('depraved heart')." Lara v. United States Parole Comm'n, 990 F.2d 839, 841 (5th Cir. 1993). Conversely, to be convicted of involuntary manslaughter, a defendant must have:

> (1) act[ed] with gross negligence, meaning a wanton or reckless disregard for human life, and (2) [had] knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another.

United States v. Fesler, 781 F.2d 384, 393 (5th Cir. 1986).

Based on the factual findings made by the district court at sentencing (which Hicks does not argue are clearly erroneous), the district court did not err when it applied the second-degree murder guideline rather than the manslaughter guideline. By intentionally firing his gun at Officer Lamance's police cruiser, which Hicks likely knew to be occupied because it had just been driven up to the field, Hicks displayed the requisite extreme recklessness and disregard for human life that constitutes malice under federal law sufficient for a finding of second-degree

27

murder.  See United States v. Shaw, 701 F.2d 367, 392 n.3, 393 (5th Cir. 1983) ("[T]o support a conviction for either first or second degree murder, the government need only prove that Shaw intended to shoot at the passing car with a 'heart . . . without regard for the life and safety of others.'") (second alteration in original) (quoting United States v. Hinkle, 487 F.2d 1205, 1207 (D.C. Cir. 1973)).  Accordingly, Hicks's contention that the district court erred by applying the second-degree murder guideline rather than the manslaughter guideline fails.

Hicks's contention that the district court erred by applying the second-degree murder guideline at sentencing without requiring proof beyond a reasonable doubt that he committed second-degree murder is similarly unavailing.  With respect to Hicks's claim that the district court's use of a lower standard of proof violated his Fifth Amendment due process rights, the court notes that it is well-settled in this circuit that a district court may increase a defendant's sentence under the Sentencing Guidelines based on facts found by the court by a preponderance of the evidence, provided that the resulting sentence does not exceed the statutory maximum expressed in the U.S. Code.  See United States v. Kinter, 235 F.3d 192, 201 (5th Cir. 2000); see also United States v. Pineiro, 377 F.3d 464, 472-73 (5th Cir. 2004), petition for cert. filed (July 14, 2004) (No. 04-5263) (refusing to hold that the Supreme Court's decision in

28

Blakely altered this ruling).

As for Hicks's contention that the district court should have applied a heightened standard of proof because he had been acquitted of murder in state court, this contention fails for two reasons. First, the fact that a state jury acquitted Hicks of capital murder does not mean that he did not commit second-degree murder under federal law, since the standard for capital murder in Texas is higher than the standard for the federal offense of second-degree murder. Compare TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a) (Vernon 2003) (requiring for capital murder that the defendant "intentionally or knowingly cause[d] the death of an individual"); with Lara, 990 F.2d at 841 (holding that death caused by extreme recklessness and a disregard for human life is sufficient for second-degree murder under federal law). Second, this court has explicitly held that a state-court jury's acquittal of a defendant for a specific crime "does not preclude the district court from finding in a sentencing hearing," by a preponderance of the evidence, that "[he] did commit that offense." United States v. Branch, 91 F.3d 699, 742-43 (5th Cir. 1996) (applying a similar cross-reference provision of U.S.S.G. § 2K2.1(c)). Accordingly, the district court did not err by applying the second-degree murder guideline to Hicks's sentence without requiring proof beyond a reasonable doubt that he committed second-degree murder.

## VI. THE USE OF CONSECUTIVE SENTENCES

Hicks next argues that the district court violated his Fifth and Sixth Amendment rights by sentencing him to a total of 180 months' imprisonment when the statutory maximum penalty for each count of the indictment was ten years.

This court reviews a district court's application of the Sentencing Guidelines, including its decision to run sentences consecutively, de novo.  United States v. Garcia, 322 F.3d 842, 845 (5th Cir. 2003).

In calculating Hicks's offense level, the district court began by adding two points to his base offense level of fourteen for the possession of three to seven firearms.  The district court then added four points under U.S.S.G. § 2K2.1(b)(5) for the use or possession of a firearm or ammunition in connection with another felony offense.  Next, the district court applied the cross-reference under U.S.S.G. § 2K2.1 based on the death of an officer to count eight, finding the second-degree murder guideline to be most applicable.  As a result, Hicks's base offense level was set at thirty three.  The district court then added three additional levels under U.S.S.G. § 3A1.2(b)(1) for the involvement of a law enforcement officer, giving Hicks a total offense level of thirty six.  Because of Hicks's criminal history category (Category I), the district court arrived at a guideline range of 188-235 months' imprisonment.  Finally, the

30

district court downwardly departed from this range because it felt that this case was outside of the heartland of cases contemplated by the Sentencing Guidelines, sentencing Hicks to 180 months' imprisonment (120 months on each count with 60 months of count one to be served consecutively to the other counts).

Hicks contends that the district court improperly sentenced him to 180 months because the statutory maximum under the U.S. Code for each count was ten years. According to Hicks, if count eight was not considered in the district court's sentencing calculation, the cross-reference under § 2K2.1 and the additional three levels under § 3A1.2 would not have applied, resulting in a total base offense level of sixteen. Hicks then argues that using the district court's finding that he was responsible for Officer Lamance's death as the basis for enhancing his sentence under count eight to a sentence above the statutory maximum applicable to each individual count violated his due process and jury trial rights, as well as the Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466 (2000).

The district court properly sentenced Hicks to 180 months' imprisonment. Since the offense level for counts one through eight largely depended on the total quantity of firearms involved, U.S.S.G. § 3D1.2 instructs the district court to group these counts together for sentencing purposes. See U.S.S.G. § 3D1.2(d) (grouping together offenses covered by U.S.S.G.

31

§ 2K2.1).  Thus, the district court's calculation of Hicks's sentence, although ultimately guided by the cross-reference to second-degree murder and by the count-eight enhancement for the involvement of a police officer, logically encompassed Hicks's conduct on all eight charges.  Moreover, since the resultant minimum total punishment required by the Sentencing Guidelines, 188 months, exceeded the statutory maximum for each count in the indictment (ten years per count), the district court was <u>required</u> to "impose consecutive sentences to the extent necessary to meet the minimum total punishment [under the Guidelines]."  <u>United States v. Garcia</u>, 322 F.3d at 845.  The only exception to this rule, which the district court employed to Hicks's benefit, derives from the court's authority to depart downwardly.  <u>See United States v. Martinez</u>, 950 F.2d 222, 226 (5th Cir. 1991) (stating that "sentencing courts retain at least some discretion under [18 U.S.C.] § 3584 [regarding the imposition of] concurrent sentence[s], but that discretion is limited to the district court's power to depart from the Guidelines").

Not only was the district court's discretion in sentencing Hicks curtailed by this circuit's precedent, but Hicks's argument that the district court violated <u>Apprendi</u>--by increasing his sentence beyond the statutory maximum based solely on factors found by the judge and not by the jury--is similarly precluded by circuit precedent.  In <u>United States v. McWaine</u>, 290 F.3d 269,

32

276 (5th Cir. 2002), this court adopted the Second Circuit's position that <u>Apprendi</u> "poses no obstacle to guideline calculations that do not result in a sentence exceeding the statutory maximum on any single count.  This is true even when the total punishment exceeds the statutory maximum on any particular count."  <u>Id.</u> (internal citations omitted).  Thus, as long as the district court's  sentence for each count did not exceed the statutory maximum, <u>Apprendi</u> is not violated even though the calculation is partly based on factors found by a judge rather than by a jury.  <u>Id.</u>; <u>see</u> <u>also</u> <u>Pineiro</u>, 377 F.3d at 472-73.  Accordingly, because Hicks's sentence on each count did not exceed the statutory maximum expressed in the U.S. Code, his Fifth and Sixth Amendment rights were not violated, and the district court's sentence was proper.

## VII. THE SUFFICIENCY OF THE EVIDENCE

Hicks next argues that the evidence presented at trial was insufficient to support his conviction under count eight of the indictment, in which he was charged with possessing two live Remington .30-30 cartridges while under a protective order.  In support of this claim, Hicks states that no witness identified him as the driver of the white pickup truck, no one testified to seeing Hicks fire the weapon that killed Officer Lamance, and the physical evidence refutes the claim that Hicks was present in the field on the night in question.

33

In reviewing a claim regarding the sufficiency of evidence, this court must determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Bellew, 369 F.3d 450, 452 (5th Cir. 2004) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). When there is a conflict over testimony, the court will defer to the fact finder's resolution with respect to the weight and credibility of the evidence. United States v. Gardea Carrasco, 830 F.2d 41, 44 (5th Cir. 1987). To be sufficient, the evidence need not exclude every reasonable hypothesis of innocence, so long as the totality of the evidence permits a conclusion of guilt beyond a reasonable doubt. United States v. Vasquez, 953 F.2d 176, 181 (5th Cir. 1992).

Hicks contends that the physical evidence presented at trial directly refuted the allegation that he shot Officer Lamance. In support of this claim, Hicks references, among other things: (1) trial testimony regarding the State's inability to match soil samples of the field to soil samples on his boots; (2) the State's inability to match tire tracks from the field to his truck's tires; (3) the absence of bois d'arc material from the undercarriage of his car when it was clear that the shooter's truck had run over such material; and (4) the absence of gunshot residue on his hands when he was arrested. Hicks also argues

34

that the evidence must be insufficient because he was acquitted of capital murder by a state jury.

Hicks's argument that the evidence presented at trial was insufficient because he was acquitted of capital murder by a state court is unconvincing. Count eight of the indictment charged Hicks with the possession of live ammunition while subject to a protective order, not with murder. Contrary to what Hicks suggests, the fact that a state-court jury acquitted Hicks of capital murder says little about whether there was sufficient evidence to show that he possessed live ammunition on December 23, 2000 (because, e.g., the state-court jury may have believed that Hicks lacked the requisite intent for capital murder while simultaneously concluding that he possessed live ammunition on the night in question). Likewise, Hicks's claim that the physical evidence shows that he did not shoot Officer Lamance is unavailing. As previously discussed, there is more than ample evidence supporting the determination that Hicks's possessed live ammunition on December 23, 2000. For instance, it was shown at trial that: (1) Hicks led the police on high-speed chases on two occasions shortly before the shooting, both of which ended in the field that was the scene of the shooting; (2) Hicks purchased a new white pickup truck shortly before the shooting that matched the description of the truck involved in the shooting; (3) after the shooting, Deputy Robbins spotted a new white pickup truck

35

leaving from the direction of the field, and he followed it to Hicks's home; (4) two .30-30 spent casings were found at the scene, and a .30-30 rifle was seized from Hicks's residence; and (5) ballistics tests showed that the two .30-30 casings found at the scene of the shooting were fired from the .30-30 rifle seized from Hicks's home.  Thus, when "all reasonable inferences and credibility choices [are] made in favor of the jury verdict[,]" it is clear that a rational jury could have found beyond a reasonable doubt that Hicks was guilty of possessing ammunition as alleged in count eight of the indictment.  United States v. Strong, 371 F.3d 225, 227 (5th Cir. 2004).

## VIII. THE VALIDITY OF THE UNDERLYING PROTECTIVE ORDER

Finally, Hicks contends that the state-court protective order against him, which is an essential element of each of his eight convictions under 18 U.S.C. § 922(g)(8), is void because it was issued by a court lacking subject-matter jurisdiction to issue it under Texas law.[10]  The district court held that this challenge by Hicks to the protective order is barred by Fifth Circuit precedent.  Hicks contends that the district court reached this legal conclusion in error.

This court reviews a district court's legal conclusions de

---

[10]    Although Hicks stipulated to the existence of the protective order below, he explicitly refused to waive his objection to the order's legality.

novo. <u>United States v. Shelton</u>, 325 F.3d 553, 557 (5th Cir. 2003); <u>United States v. Cabrera-Teran</u>, 168 F.3d 141, 143 (5th Cir. 1999).

Hicks claims that the court that issued the protective order--the Fannin County Court--did not have jurisdiction to issue the order. The district court, however, held that this challenge to the Fannin County Court's jurisdiction was barred by this court's decision in <u>United States v. Emerson</u>, 270 F.3d 203 (5th Cir. 2001). In <u>Emerson</u>, the defendant asserted that his firearms conviction should be overturned because the court that entered the restraining order had implicitly, but not explicitly, found that he posed a credible threat to his family or a child (a finding required for a conviction under 18 U.S.C. § 922(g)(8)). The <u>Emerson</u> court refused to entertain this challenge to the restraining order because "nothing in section 922(g)(8) suggests that the validity of the particular predicate court order may be inquired into in the section 922(g)(8) criminal prosecution." <u>Id.</u> at 213. The court then concluded that a defendant "may not collaterally attack [a] predicate order in [a] section 922(g)(8) prosecution, at least so long as the order . . . is not so transparently invalid as to have only a frivolous pretense to validity." <u>Id.</u> at 264.

Hicks argues that his collateral attack against the state-court protective order is not barred by the rule announced in

<u>Emerson</u> because the protective order against him was facially invalid. In support of this claim, he states that his ex-wife applied for the protective order in the <u>County Court</u> for Fannin County less than a month after the 336th Judicial <u>District Court</u> finalized the couple's divorce. According to Hicks, under Texas law, his ex-wife was required to file her protective order application in the <u>same court</u> that had entered the divorce decree, i.e., the 336th Judicial District Court. <u>See</u> TEX. FAM. CODE ANN. § 85.063 (West 2002) (after a divorce is complete, an application for a protective order by a party wishing to obtain one "shall be filed in the court that rendered the final order [of divorce] . . . ."); <u>see also</u> <u>Cooke v. Cooke</u>, 65 S.W.3d 785, 790 (Tex. App.--Dallas 2001, no pet.). Thus, Hicks contends that the Fannin County Court lacked subject-matter jurisdiction over his wife's application for a protective order and, accordingly, the protective order was void ab initio.

Hicks's argument that the protective order was void ab initio fails in light of this circuit's rule against collaterally attacking protective orders in criminal proceedings brought under 18 U.S.C. § 922. While <u>Emerson</u> is this circuit's only relevant precedent directly mentioning § 922(g)(8), the two main cases on which it relies--<u>Lewis v. United States</u>, 445 U.S. 55 (1980) and <u>United States v. Chambers</u>, 922 F.2d 228 (5th Cir. 1991)--explain why Hicks may not collaterally attack the protective order here.

38

In Lewis, a defendant charged as a felon in possession of a firearm, in violation of the predecessor to § 922(g), argued that his predicate felony conviction was invalid because he was deprived of his constitutional right to representation by counsel when he was convicted of the underlying felony. Lewis, 445 U.S. at 56-58. The Supreme Court disagreed that this constitutional error, which it assumed had occurred, affected the defendant's status under the statute as a person who had been convicted of a felony. Id. at 60. Specifically, the Supreme Court found that the federal firearms statute was meant to prevent all convicted felons from possessing firearms, regardless of whether the "felony conviction ultimately might turn out to be invalid," since "'[n]othing on the face of the statute suggests a congressional intent to limit its coverage to persons [whose convictions are not subject to collateral attack].'" Id. at 62 (second alteration in original) (quoting United States v. Culbert, 435 U.S. 371, 373 (1978)). Concluding that "Congress clearly intended that the defendant clear his status [as a convicted felon] before obtaining a firearm," the Supreme Court affirmed the defendant's felon-in-possession conviction without entertaining the defendant's collateral attack on the predicate felony. Lewis, 445 U.S. at 64, 66.

This court extended Lewis's reasoning to a subsection of 18 U.S.C. § 922 in Chambers, 922 F.2d. at 238. In Chambers, the

39

defendant was convicted of receiving a firearm while "under indictment for a crime punishable by imprisonment for a term exceeding one year," in violation of 18 U.S.C. § 922(n). Chambers, 922 F.2d at 231 (quoting 18 U.S.C. § 922(n)). After the jury entered its verdict, Chambers successfully moved in state court to quash the indictment that formed the basis of his § 922(n) conviction by demonstrating that the grand jury was improperly empaneled under Texas law. On appeal to this court, Chambers contended that he had not violated § 922(n) because he was only subject to an invalid indictment on the date he received the firearm. This court disagreed, holding that "[t]he federal gun laws . . . focus not on reliability, but on the mere fact of conviction, or even indictment, in order to keep firearms away from potentially dangerous persons." Chambers, 922 F.2d at 238 (alterations in original) (quoting Lewis, 445 U.S. at 67). This court further observed that, under federal law, a lack of subject-matter jurisdiction does not generally "render void the final judgment of a court" unless the court's attempt to exert jurisdiction was "a manifest abuse of authority." Id. at 239. With these two principles in mind, the court concluded:

> [E]ven if Chambers' state indictment were ultimately held to be so invalid as to confer no jurisdiction whatever on the state court, its pretense to validity was nevertheless not so frivolous or transparent that Chambers could simply ignore it and notwithstanding its pendency engage in the self-help of acquiring a firearm. We believe that Congress, in section 922(n), intended that in such a situation firearms acquisitions be postponed until the validity of the

40

indictment is determined.

Id. at 240.

Like the provisions at issue in Lewis and Chambers, nothing in the language of 18 U.S.C. § 922(g)(8) indicates that it applies only to persons subject to a valid, as opposed to an invalid, protective order.  Moreover, when Hicks's ex-wife obtained the protective order, it was standard practice for the Fannin County Court to entertain applications for protective orders submitted after divorces were rendered by the 336th Judicial District Court because the District Court sat in Fannin County only one week per month (it sat in Grayson County for the rest of the month, including on the day that Hicks's ex-wife filed her application for a protective order).  Thus, the protective order at issue had more than a frivolous pretense to validity.  If Hicks truly believed that it was invalid, he should have objected to the Fannin County Court's subject-matter jurisdiction at the original court hearing, appealed the order for lack of jurisdiction, or sought a writ of mandamus from the local appellate court before possessing either firearms or ammunition.  See Cooke, 65 S.W.3d at 785, 787-88.  Because Hicks did not take any of these steps, he violated the plain meaning of 18 U.S.C. § 922(g)(8) by possessing firearms and ammunition while he was subject to a protective order, and his conviction stands.

## IX. CONCLUSION

41

For the foregoing reasons, we AFFIRM Hicks's conviction and sentence.