UNITED STATES of America,
Plaintiff–Appellee,

v.

Gina Antoinette BROWNER,
Defendant–Appellant.

No. 88–1838.

United States Court of Appeals,
Fifth Circuit.

Nov. 16, 1989.

Ricardo D. Gonzalez, Walter L. Boyaki, Miranda & Boyaki, El Paso, Tex., for defendant-appellant.

Philip Police, LeRoy Morgan Jahn, Asst. U.S. Atty., Helen M. Eversberg, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before THORNBERRY, GARWOOD, and DUHÉ, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Gina Antoinette Browner (Mrs. Browner) was charged with voluntary manslaughter in connection with the stabbing death of Curtis Browner (Mr. Browner), her husband. She was convicted following a jury trial in the United States District Court for the Western District of Texas. In this appeal from her conviction, she primarily challenges the district court's refusal to instruct the jury on the lesser included offense of involuntary manslaughter. We agree with this contention and

accordingly reverse and remand for another trial.

## Facts and Proceedings Below

Mr. and Mrs. Browner were married in 1985. Mr. Browner served as a Private First Class in the United States Army, and in early 1987 he was transferred to Fort Bliss Military Reservation near El Paso, Texas. The couple lived in on-base housing with Mrs. Browner's three-year-old daughter, Stephanie, who was a child of hers from a prior relationship.

The evidence showed that the Browners' marriage was replete with violence. Explosive public arguments between the two of them were apparently a frequent event both in their housing area and in the mess hall where Mr. Browner worked. The violence was mutual. On the one hand, Mr. Browner had a short temper that often degenerated into physical abuse of his wife and her daughter. On the other hand, at least three of their arguments culminated in Mrs. Browner publicly threatening Mr. Browner with large kitchen knives, all within the first several weeks of their residence at Fort Bliss.

On February 7, 1987, yet another fight erupted between Mr. and Mrs. Browner, and ultimately resulted in Mr. Browner's death. On that evening, Mr. Browner had been helping his friend Specialist Robert Hughes fix the frame to his waterbed. When Mr. Browner returned to his apartment to get a faucet adaptor to refill the waterbed mattress, he and his wife began to fight. Mrs. Browner testified that her husband began threatening and taunting her, shouting at her, following her throughout the house, preventing her from leaving. According to Mrs. Browner, he struck her daughter Stephanie as well. Finally, Mrs. Browner testified, she and Mr. Browner ended up in the kitchen, where he backed her into a corner near a cannister of knives. She pulled one of the knives from behind her back with her right hand, although she

is left-handed. She threatened him with it, shouting at him to leave her alone. When she pulled the knife, he became even more enraged. A struggle ensued, and Mrs. Browner claims that she accidentally stabbed her husband in the shoulder.

The jury could have concluded that while most shoulder wounds are not life threatening, the wound Mrs. Browner inflicted on her husband breached a narrow gap between his arm bone and rib cage, and severed a major artery in his chest. He began bleeding profusely, and he was dead within a half hour. Mrs. Browner called for an ambulance and called Specialist Hughes, who immediately came to the scene. Military Police arrived a few minutes later, and some time after that the Emergency Medical Service ambulance arrived as well. All attempts to revive Mr. Browner on the scene and in the emergency room of a nearby hospital failed.

On April 21, 1988, a grand jury charged Mrs. Browner with voluntary manslaughter committed in the special maritime and territorial jurisdiction of the United States in violation of 18 U.S.C. § 1112.[1] At the close of the evidence after a three-day trial, defense counsel requested the district court to instruct the jury on involuntary manslaughter as a lesser included offense, but without explanation the court refused. Mrs. Browner was convicted. On her appeal, she again challenges the district court's denial of her request for an involuntary manslaughter instruction.

## Discussion

■ Rule 31(c) of the Federal Rules of Criminal Procedure provides in relevant part that a "defendant may be found guilty of an offense necessarily included in the offense charged." This rule entitles a defendant to a jury instruction on any lesser included offense whenever two independent prerequisites have been met: (1) the elements of the lesser offense must be a

---

1. The indictment also charged Mrs. Browner with murder and aggravated assault under state law, Tex.Penal Code §§ 19.02 & 22.02(a)(4), and the Assimilative Crimes Act, 18 U.S.C. § 13. The district court dismissed those counts before trial because both types of conduct could have been indicted under federal law. *See* 18 U.S.C. § 113(c) (assault with a dangerous weapon); 18 U.S.C. § 1111 (murder). This ruling is not before us.

subset of the elements of the charged offense; and (2) the evidence at trial must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater. *Schmuck v. United States,* — U.S. —, 109 S.Ct. 1443, 1450 & n. 8, 103 L.Ed.2d 734 (1989); *Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973). The purpose of this protection is to prevent juries from improperly resolving their doubts in favor of conviction when one or more of the elements of the charged offense remain unproven, but the defendant seems plainly guilty of *some* offense. *See Keeble,* 93 S.Ct. at 1998. On the facts of this case, both prerequisites were satisfied, and Mrs. Browner was entitled to the protection of the rule.

*I. Is involuntary manslaughter a lesser included offense of voluntary manslaughter?*

■ Determining whether the first prerequisite, or the "elements test," has been met requires a comparison of the statutory elements of the offenses involved without reference to the conduct proven at trial. *Schmuck,* 109 S.Ct. at 1450. Rule 31(c) requires that the lesser included offense be "necessarily included in the offense charged," and the Supreme Court has construed this language to mean that the statutory elements of the lesser offense must constitute a subset of the elements of the charged offense, so that the charging language in the indictment places the defendant on notice that he may be convicted of either crime. *Id.* at 1451.

The first issue in this case, therefore, is whether the elements of the federal crime of involuntary manslaughter constitute a subset of the elements of voluntary manslaughter. Both crimes are established in 18 U.S.C. § 1112(a), which provides:

"(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

"Voluntary—Upon a sudden quarrel or heat of passion.

"Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."

In contrast, the federal murder statute, 18 U.S.C. § 1111(a), provides:

"(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

"Any other murder is murder in the second degree."

Unlike the homicide statutes in some modern penal codes that specifically define each element of the various degrees of criminal homicide, *see, e.g.,* Tex.Penal Code §§ 19.02–19.07 (1989); Model Penal Code §§ 210.1–.4 (1985), the federal homicide statutes simply adopt the language of the traditional common-law offenses of murder and manslaughter. *United States v. Shaw,* 701 F.2d 367, 392 (5th Cir.1983), *cert. denied,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984); *see also* 40 Am. Jur.2d *Homicide* §§ 7 & 42 (1968); 40 C.J.S. *Homicide* §§ 13 & 37 (1944). At both common law and in the federal statutes, the hierarchy of criminal homicide turns in large part on the ancient concept of "malice," a term of art the legal significance of which bears little if any relationship to the ordinary meaning of the word. *See* 2 W. LaFave & A. Scott, *Substantive Criminal Law* §§ 7.1(a) & 7.9 (1986) (hereinafter LaFave & Scott); *see also United States v. Chagra,* 638 F.Supp. 1389, 1397–99 (W.D.Tex.), *aff'd,* 807 F.2d 398 (5th Cir. 1986), *cert. denied,* 484 U.S. 832, 108 S.Ct. 106, 98 L.Ed.2d 66 (1987).

Over the centuries, common-law "malice" in the homicide context has come to encompass at least three distinct mental states, any one of which constitutes sufficient culpability for murder. These mental states

include: (1) intent to kill; (2) intent to do serious bodily injury; and (3) the existence of a "depraved heart," another term of art that refers to a level of extreme recklessness and wanton disregard for human life.[2] LaFave & Scott, *supra*, § 7.1, at 183. Each of these mental states constitutes malice under the federal murder statute as well. *E.g., Chagra*, 638 F.Supp. at 1401; *see also Chagra*, 807 F.2d at 402; *United States v. Harrelson*, 766 F.2d 186, 189 n. 5 (5th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985); *Shaw*, 701 F.2d at 392 n. 20. Thus, second degree murder under the federal statute includes (1) the physical element of unlawfully causing the death of another, and (2) the mental element of malice, satisfied either by an intent to kill, an intent to cause serious bodily injury, or the existence of a depraved heart.

The common law did not originally distinguish between what are now the offenses of manslaughter and murder. *E.g.*, LaFave & Scott, *supra*, § 7.12, at 276–77. Eventually, however, the ancient courts separated the offenses, the distinction turning upon the presence or absence of malice. *Id.* at n. 1. The separate offense of voluntary manslaughter emerged as an intentional killing that is nonetheless deemed to be without malice because it occurs in what the courts called "the heat of passion," a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances that would provoke such a passion in an ordinary person, but which did not justify the use of deadly force. *See id.* § 7.10; *see also* 40 Am. Jur.2d *Homicide* § 56 (1968). Again, the federal statute simply declares the language of the common-law offense, and so when the defendant, without legal justification but actuated by a sudden passion of fear or rage arising from attendant circumstances that would provoke such passion in an ordinary person, kills intentionally (or with one of the other mental states that constitutes malice), the killing is neverthe-

less deemed to be in the *absence of malice* under the federal statute. *E.g., United States v. Collins*, 690 F.2d 431, 437 (5th Cir.1982), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 801 (1983). The malice that would otherwise attach is *negated* by the fact that the intentional killing occurred in the heat of passion in response to a sufficient provocation. *E.g., United States v. Scafe*, 822 F.2d 928, 932 (10th Cir.1987).

Voluntary manslaughter is a lesser included offense of murder, *e.g., id.*, although that is less than obvious from the bare language of the statutes. The common-law background clarifies this relationship. As noted above, adequately provoked heat of passion *negates* malice in an intentional, unjustified killing. Since malice is an element of murder, no murder can occur when a sufficient provocation induces the requisite heat of passion. Thus, the malice element of the traditional offense of murder implicitly forces prosecutors to *disprove* the existence of adequate provocation when the evidence suggests that it may be present. As a result, conviction for voluntary manslaughter as a lesser included offense on an indictment for murder is not uncommon. *See, e.g., United States v. Comosona*, 848 F.2d 1110 (10th Cir.1988); *United States v. Lincoln*, 630 F.2d 1313 (8th Cir.1980); *United States v. Lopez*, 575 F.2d 681 (9th Cir.1978); *United States v. Reagan*, 453 F.2d 165 (6th Cir.1971).

Involuntary manslaughter is also a lesser included offense of murder. *E.g., Lincoln*, 630 F.2d at 1320. Again, however, this relationship is less than obvious from the bare language of the statute. As with voluntary manslaughter, the English courts originally did not distinguish involuntary manslaughter from murder, but gradually recognized it as a culpable homicide that was nonetheless not culpable enough to be punished as murder; and again, as with voluntary manslaughter, this distinction was said to lie in the presence or

---

**2.** The common law also recognized a fourth variety of malice, commonly known as the "felony murder" rule. LaFave & Scott, *supra*, § 7.1(a), at 182; *see generally, id.* § 7.5. Some aspects of this traditional rule survive in the provisions of the federal statute elevating the seriousness of murder committed in the course of certain felonies. *See* 18 U.S.C. § 1111(a).

absence of malice. LaFave & Scott, *supra*, § 7.12, at 276–77.

In contrast to the case of voluntary manslaughter, however, the absence of malice in involuntary manslaughter arises not because of provocation induced passion, but rather because the offender's mental state is not sufficiently culpable to meet the traditional malice requirements. At common law, the *physical* element of involuntary manslaughter remains the same as the physical element of murder: unlawfully causing the death of another. But the requisite mental state is reduced to "gross" or "criminal" negligence, a culpability that is far more serious than ordinary tort negligence but still falls short of that most extreme recklessness and wantonness required for "depraved heart" malice. *E.g.*, LaFave & Scott, *supra*, §§ 7.1, 7.12(a). Section 1112 adopts this common-law approach, describing manslaughter as "an unlawful killing ... [i]n the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." We have defined the requisite culpability to require

> "that the defendant (1) act with gross negligence, meaning a wanton or reckless disregard for human life, and (2) have knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another." *United States v. Fesler*, 781 F.2d 384, 393 (5th Cir.), *cert. denied*, 476 U.S. 1118, 106 S.Ct. 1977, 90 L.Ed.2d 661 (1986).

Thus, involuntary manslaughter under the federal statute differs from murder only in that it requires a reduced level of culpability in committing the same physical act. As a matter of black letter law, that is sufficient to make it a lesser included offense. *See, e.g.*, Model Penal Code § 1.07(4)(c) (1985).[3] As such, federal courts regularly submit involuntary manslaughter to juries as a lesser included offense of murder. *See, e.g., Fesler*, 781 F.2d at 388; *see also United States v. Begay*, 833 F.2d 900 (10th Cir.1987); *United States v. Iron Shield*, 697 F.2d 845, 846 (8th Cir.1983).

It follows from the preceding discussion that involuntary manslaughter is also necessarily a lesser included offense of voluntary manslaughter. Voluntary manslaughter encompasses all of the elements of murder: it requires proof of the physical act of unlawfully causing the death of another, and of a mental state that *would* constitute malice, but for the fact that the killing was committed in adequately provoked heat of passion or provocation. Involuntary manslaughter requires proof only of a subset of those elements: the same physical act, but only a reduced mental state and no requirement at all for heat of passion or provocation. Thus, under the elements test, involuntary manslaughter under the federal statute is necessarily a lesser included offense of voluntary manslaughter. *See, e.g., United States v. Eagle Elk*, 711 F.2d 80, 81 (8th Cir.1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984); *United States v. Skinner*, 667 F.2d 1306, 1309 n. 1 (9th Cir.1982), *cert. denied*, 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983). In the present case, therefore, the first prerequisite for an instruction under Rule 31(c) is satisfied.[4]

---

**3.** As an abstract theoretical matter, one might argue that the lesser culpability of "gross negligence" is a culpability that is *different* from, and not a subset of the "intent" or "depraved heart" culpability required for murder. One might conclude from this philosophical distinction that the strict literal force of the elements test adopted by the Supreme Court in *Schmuck, supra*, modifies the traditional rule regarding offenses that differ only in the level of culpability. But while this concept of "lesser included" culpability may be a legal fiction, it is a deeply entrenched one, and we do not believe the Supreme Court intended to uproot it with its decision in *Schmuck.* This reading of *Schmuck* is

supported by the Court's heavy reliance on tradition in its decision to adopt the elements test in the first place. *See Schmuck*, 109 S.Ct. at 1450–52.

**4.** Our holding that involuntary manslaughter meets the elements test for being a lesser included offense of voluntary manslaughter under section 1112 (and of murder under section 1111) is directed to involuntary manslaughter by gross negligence (*see Fesler*, 781 F.2d at 393). We do not address, for example, whether, or if so under what circumstances, so-called misdemeanor involuntary manslaughter under section 1112 could meet the elements test to be a lesser

## II. Is the evidence sufficient to require the requested instruction?

■ Having concluded that involuntary manslaughter is necessarily included in the indictment for voluntary manslaughter, we must now determine whether a jury could rationally conclude from the evidence that Mrs. Browner was guilty of involuntary manslaughter and not of the charged offense. We determine that the evidence, though sufficient to sustain a voluntary manslaughter conviction, was likewise sufficient to allow the jury to alternatively conclude that Mrs. Browner was not guilty of that offense but was guilty of involuntary manslaughter.

The tape admitted at trial reveals that in Mrs. Browner's call for an ambulance immediately after the stabbing, she told the operator she had "accidentally cut" her husband. When Specialist Hughes arrived at the scene, he testified that she was hysterical and that the first thing she said to him was, "Oh, God, I'm sorry, Robert, I didn't mean to do it." Sergeant Utry, one of the military policemen who responded to the stabbing, also testified that Mrs. Browner told him that she did not mean to cut her husband. She said the same thing to Sergeant Schroeder, the military policewoman who transported her to the Military Police station. Later, shortly after two o'clock in the morning, Mrs. Browner gave a lengthy statement to a special agent with the Criminal Investigation Command, and again admitted to having stabbed her husband, but again asserted that while she intended to threaten him with the knife, the stabbing itself was an accident. The next day, she gave a similar statement to a special agent with the Federal Bureau of Investigation, and again throughout her testimony to the grand jury and at trial, Mrs. Browner repeatedly asserted that she never intended to injure her husband. She admitted that she threatened Mr. Browner with the knife in an attempt to defend herself, but claimed that she did not intend to cut him. That, she has persistently claimed, was an accident.

At trial, the government built its case on circumstantial evidence to the contrary. It presented expert testimony that the wound inflicted required more force than one would expect from an accidental injury by the attacker's nondominant hand. It presented a variety of physical evidence and the testimony of a downstairs neighbor, who overheard part of the argument, that conflicted with various parts of Mrs. Browner's story. It presented evidence that Mrs. Browner was the aggressor in many of their arguments, that she was bigger than Mr. Browner, and that other testimony as to Mr. Browner's mood on the night of the stabbing is inconsistent with her description of his demeanor. Finally, the government drew out certain inconsistencies between the several statements that Mrs. Browner had given to investigators, witnesses, and the grand jury. Based on this impeachment and contrary circumstantial evidence, the government urged the jury to infer that Mrs. Browner was lying, that she had intentionally stabbed her husband, and that she had intended to kill him or at least to cause him serious bodily harm.

Thus, the key factual dispute in this trial turned on Mrs. Browner's mental state when she stabbed her husband. If Mrs. Browner intended to kill or seriously injure her husband, then she is guilty of at least voluntary manslaughter and perhaps murder. If, however, the stabbing and consequent death of her husband was accidental, she could still be convicted of involuntary manslaughter if the jury determined that under these circumstances her making wild swings of the knife near her husband was grossly negligent (under *Fesler*) though not done with the intent to kill or to actually inflict bodily injury. There was sufficient evidence in the record to sustain a jury finding either way, and therefore Mrs. Browner was entitled to an instruction on the lesser included offense.

The government argues that Mrs. Browner's claim of self-defense obviates any right to an instruction on involuntary manslaughter. This argument rests on the

included offense of voluntary manslaughter or   murder.

fallacious premise that the only disputed fact in this trial was whether Mrs. Browner acted in self-defense when she stabbed her husband. The government concludes that since self-defense would be an absolute defense to either offense, a jury could not rationally find the defendant guilty of one and not the other.

As the preceding discussion makes clear, however, the central factual dispute concerned Mrs. Browner's mental state at the time of the stabbing, not simply whether she acted in self-defense. It is true that counsel for Mrs. Browner urged the jury to consider the issue of self-defense, and it is also true that a claim of self-defense is inconsistent with the proposition that the stabbing was accidental. Nonetheless, it is well established that a criminal defendant may raise inconsistent defenses, and is entitled to an instruction on any defense or lesser included offense whenever there is evidence sufficient for a reasonable jury to find in her favor, even when the defense and lesser included offense are inconsistent with each other. *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988). The fact that Mrs. Browner's counsel suggested to the jury that she may have acted in self-defense does not change the fact that there was sufficient evidence in the record to allow the jury to conclude that she never intended to actually stab her husband. That, after all, was the primary thrust of her defense and of her testimony. Because the jury could also have concluded that her wild swinging of the knife near her husband was grossly negligent under the circumstances, she was entitled to an instruction on involuntary manslaughter.[5]

The cases cited by the government in which courts refused to give involuntary manslaughter instructions in light of self-defense claims are not to the contrary. *See Skinner*, 667 F.2d at 1306; *Bishop v. Mazurkiewicz*, 634 F.2d 724 (3d Cir.1980), *cert. denied*, 452 U.S. 917, 101 S.Ct. 3053, 69 L.Ed.2d 421 (1981); *United States v. Smith*, 521 F.2d 374, 377 (10th Cir.1975). In none of these cases was there any evidence indicating that the killing was accidental. In each, the factual issue was whether the defendant had used excessive force in attacks that were indisputably intentional but allegedly in self-defense. In the present case, however, the crucial dispute was whether the stabbing itself was intentional. Thus, the case is much closer to *Iron Shield*, 697 F.2d at 845, and *Begay*, 833 F.2d at 900. In both of those cases, instructions on involuntary manslaughter as a lesser included offense to murder were upheld despite claims of self-defense. Both cases involved stabbings and in each case there was sufficient evidence to sustain a finding that the stabbing itself was accidental. These cases make clear that there is no *per se* rule against involuntary manslaughter instructions in the light of a claim of self-defense, but that in each case the issue is whether the evidence is sufficient to allow the jury rationally to find the defendant guilty of the lesser included offense and not of the offense charged. *See also United States v. Manuel*, 706 F.2d 908, 915 (9th Cir.1983). In the present case, the evidence was sufficient to sustain such a finding.

### Conclusion

For these reasons, the district court erred in denying the requested instruction on involuntary manslaughter. We therefore reverse Mrs. Browner's conviction and remand this case to the district court for

---

**5.** The government also incorrectly asserts that Mrs. Browner's claim that the stabbing was an accident requires acquittal on both charges, and thus does not justify instruction on the lesser included offense. Her claim of accident leaves unresolved the issue whether the accident was a result of Mrs. Browner's gross negligence. There is sufficient evidence to sustain a finding that it was. Thus, while it would require an acquittal on the charged offense, a jury finding that the stabbing was accidental would not nec-

another trial.[6]

REVERSED and REMANDED.

essarily require acquittal on the lesser included offense of involuntary manslaughter.

**6.** Mrs. Browner also complains on appeal of certain evidentiary rulings below, and alleges prosecutorial misconduct in cross-examination and closing argument. None of these objections, however, would require more than a remand for a new trial, and since they may not occur or occur in the same context in a second trial, our decision to remand on the lesser in-

cluded offense instruction issue makes it unnecessary to reach the other issues on this appeal.

Similarly, the various pending motions of the parties relative to inclusion of certain trial exhibits in the record on appeal—on none of which (singly or collectively) does the sufficiency of the evidence of either voluntary manslaughter or involuntary manslaughter (or our decision as to the failure to instruct on the latter) depend—are rendered moot by our remand decision.