REVISED MARCH 23, 2009

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 5, 2009

Charles R. Fulbruge III
Clerk

No. 08-40445

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

FERNANDO LEMUS-GONZALEZ,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 5:07-CR-451-1

Before DAVIS, SMITH, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Fernando Lemus-Gonzalez was sentenced to 360 months of imprisonment for transporting illegal aliens for commercial advantage or private gain resulting in the death of five aliens. He appeals, contending that the Guidelines provision for second-degree murder should not have been applied and alternatively, that his sentence is unreasonable. We affirm.

I

Lemus-Gonzalez, a citizen of Mexico who had been living illegally in Conroe, Texas for approximately fifteen years, was hired by a man known as "Lalo" to transport three undocumented aliens for $400 each. In furtherance of this agreement, Lemus-Gonzalez drove his sport utility vehicle (SUV), accompanied by Lalo, from Conroe, which is north of Houston, to the border between Texas and Mexico. Lemus-Gonzalez later admitted to authorities that during this portion of the trip, he consumed a twelve-pack of beer. Near Mission, Texas, Lemus-Gonzalez and Lalo stopped at a house, and nine undocumented aliens were loaded into the SUV. Lemus-Gonzalez was aware that his vehicle contained more than the agreed-upon three aliens, though he did not know exactly how many were on board, but he agreed to transport all of them.

Lemus-Gonzalez departed in a caravan with two other SUVs, one driven by Lalo. Lalo maintained contact by mobile phone. Between Mission and Hebbronville, Lemus-Gonzalez made a stop to purchase more beer before continuing the journey.

Roving border patrol agents traveling south from Hebbronville, Texas saw the three SUVs traveling north in tandem. Suspecting that the vehicles might be transporting illegal immigrants, the border patrol agents reversed course to take a closer look. The rear two SUVs in the smuggling caravan moved to the shoulder of the road to allow the agents to pass, but the lead SUV, driven by Lemus-Gonzalez, sped away after Lalo instructed him by mobile phone to accelerate. The agents achieved speeds of seventy to seventy-five miles per hour but did not close in on Lemus-Gonzalez until he reached a stop sign at an intersection. At that point the agents noticed that the SUV was riding low to the

ground, even though only the driver and one passenger were visible. The agents decided to conduct an immigration stop.

When the agents turned on their overhead lights, Lemus-Gonzalez sped away towards Hebbronville. Lalo then told Lemus-Gonzalez that he was on his own and terminated the phone call. The agents deactivated their overhead lights and informed the county sheriff's department that Lemus-Gonzalez's SUV had failed to yield and was approaching the Hebbronville community at a high rate of speed. The agents attempted to follow at a safe distance but did not keep pace with Lemus-Gonzalez because they were nearing the town, and there was considerable activity at this time of day. The agents lost sight of the SUV but soon afterwards heard a report of a major accident in Hebbronville. When they arrived at the scene, they saw that Lemus-Gonzalez's SUV had crashed into a steel post in a heavily trafficked area.

Lemus-Gonzalez could not remember anything immediately prior to or after the accident. However, the ensuing investigation revealed that Lemus-Gonzalez had lost control of his SUV when, traveling at excessive speed, the vehicle traversed a railroad crossing and became airborne for approximately half of a city block. A mother and her ten-month-old baby were sitting in the front seat next to Lemus-Gonzalez and died on impact. The child's leg was severed during the crash and was found outside the SUV. The child's body was beneath the vehicle. The mother's foot was severed at the ankle. Between the front and second-row seats of Lemus-Gonzalez's SUV, three aliens had been lying horizontally, stacked one on top of the other to avoid being seen as passengers. The illegal immigrant in the middle survived the crash. The other two did not. The third row of seats had been lowered and four aliens were in the cargo area of the SUV, three of whom survived. The "jaws of life" were necessary to free one

of the survivors who was trapped in the wreckage. None of the passengers were using seatbelts or other restraints while traveling in the SUV. In total, five of the nine illegal immigrants Lemus-Gonzalez agreed to transport died on impact, and the other four required medical attention.

At the crash scene, Lemus-Gonzalez smelled of alcohol. A Department of Public Safety trooper saw an open beer and several unopened beers in the driver's foot well area in the SUV. When Lemus-Gonzalez arrived at the hospital, his blood alcohol level was determined to be 0.07%. Lemus-Gonzalez had two prior convictions for driving while intoxicated.

Lemus-Gonzalez pleaded guilty to eight counts of transporting illegal aliens for commercial advantage or private gain resulting in the death of five of the aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (B)(iv), and 18 U.S.C. § 2. The Presentence Report (PSR) recommended a base offense level of 38, applying a cross-reference in the alien-transporting guideline[1] to the appropriate homicide guideline, which the PSR concluded should be second-degree murder.[2] The grouping rules for multiple counts were applied, resulting in a combined offense level of 43.[3] After a three-level reduction for acceptance of responsibility, the total offense level was 40. Lemus-Gonzalez's two prior DWI convictions placed him in criminal history category II. The resulting advisory Guidelines range was 324–405 months of imprisonment.

Lemus-Gonzalez objected to the application of the second-degree murder guideline, arguing that the involuntary manslaughter guideline was more

---

[1] U.S. SENTENCING GUIDELINES MANUAL § 2L1.1(c)(1) (2007).

[2] Id. § 2A1.2.

[3] Id. § 3D1.4.

appropriate because he lacked malice, which is necessary for second-degree murder. The Government argued that the second-degree murder guideline was appropriate and, in the alternative, that the court should apply a non-Guidelines sentence that "adequately and reasonably reflect[s] the purposes of sentencing" pursuant to 18 U.S.C. § 3553(a).

The district court overruled Lemus-Gonzalez's objection to the application of the second-degree-murder guideline and accepted the PSR's recommendations. The court found that Lemus-Gonzalez acted with "extreme recklessness and a wanton disregard for human life" by drinking while driving and fleeing from the border patrol agents. In the alternative, the court stated that it would have imposed the same sentence in light of the sentencing factors set forth in § 3553(a), "should it turn out that the court is wrong" regarding the application of the Guidelines. The court found the testimony presented and the facts recited in the PSR to be true. The court concluded that a 78-month sentence, which would be within a Guidelines range of 63 to 78 months for multiple counts of alien smuggling without reference to reckless endangerment under § 3C1.2 of the Guidelines, would be "extremely low" and would not be "reasonable under any circumstances of this particular case." The court sentenced Lemus-Gonzalez to 360 months of imprisonment.

II

Lemus-Gonzalez argues that the district court erred in applying the second-degree-murder guideline rather than the involuntary-manslaughter guideline and that such an error was not harmless because the district court's alternative non-Guidelines sentence was unreasonable. These objections were raised in the district court, so we review the district court's factual findings for

clear error and its interpretation of the Sentencing Guidelines de novo.[4]   When reviewing sentences for reasonableness, the standard of review is abuse of discretion, regardless of whether the sentence imposed is within or outside the advisory Guidelines range.[5]

A

When the transportation of unlawful immigrants results in death, § 2L1.1(c) of the Sentencing Guidelines directs a sentencing court to apply "the appropriate homicide guideline."[6]   Lemus-Gonzalez argues that the appropriate homicide guideline for his conduct was involuntary manslaughter, not second-degree murder.  This would result in an advisory Guidelines sentencing range of 78 to 97 months of imprisonment.

Under federal law, second-degree murder requires "malice aforethought," a higher degree of culpability than that for involuntary manslaughter.[7]   Our court has distinguished second-degree murder from involuntary manslaughter as follows:

> Malice aforethought "encompasses three distinct mental states: (1) intent to kill; (2) intent to do serious bodily injury; and (3) extreme recklessness and wanton disregard for human life ('depraved heart')." Lara v. United States Parole Comm'n, 990 F.2d 839, 841 (5th Cir. 1993).  Conversely, to be convicted of involuntary manslaughter, a defendant must have:

---

[4] United States v. Hicks, 389 F.3d 514, 529 (5th Cir. 2004).

[5] Gall v. United States, 128 S. Ct. 586, 597 (2007).

[6] U.S.S.G. § 2L1.1(c)(1) (2007) ("If death resulted, apply the appropriate homicide guideline from Chapter Two, Part A, Subpart 1, if the resulting offense level is greater than that determined under this guideline.").

[7] Compare 18 U.S.C. § 1111, with 18 U.S.C. § 1112; see also Hicks, 389 F.3d at 530.

(1) act[ed] with gross negligence, meaning a wanton or reckless disregard for human life, and (2) [had] knowledge that his or her conduct was a threat to the life of another or knowledge of such circumstances as could reasonably have enabled the defendant to foresee the peril to which his or her act might subject another.[8]

We have therefore held that "extreme" conduct is the degree of differentiation between second degree murder and involuntary manslaughter. Extreme recklessness and wanton disregard for human life will establish second-degree murder but not recklessness and wanton disregard for human life, which is the culpability for involuntary manslaughter.

Lemus-Gonzalez correctly points out that the Sentencing Commission's commentary to § 2A1.4, which sets forth the base offense level for involuntary manslaughter, states that "[a] homicide resulting from driving a means of transportation, or similarly dangerous actions, while under the influence of alcohol or drugs ordinarily should be treated as reckless."[9] Lemus-Gonzalez contends that his conduct is within this range of culpability. However, the inclusion of the word "ordinarily" suggests that the Commission envisioned some circumstances under which a homicide resulting from driving under the influence could be deemed extremely reckless.

While we review the district court's underlying factual findings for clear error, we review the application of the cross-referencing provisions in

---

[8] Hicks, 389 F.3d at 530 (quoting United States v. Fesler, 781 F.2d 384, 393 (5th Cir. 1986)).

[9] U.S.S.G. § 2A1.4 cmt. n.1 (2007).

§ 2L1.1(c)(1), de novo.[10]  The basis of the district court's determination that Lemus-Gonzalez was extremely reckless and demonstrated a wanton disregard for human life included the facts that:  he drank a substantial amount of beer en route to picking up the aliens; stopped to purchase more alcohol while transporting the aliens; an open container of beer was found in the foot well of his driver's seat; the aliens were not wearing any safety restraints while being transported in the SUV; an infant was traveling in the arms of the mother in the front passenger seat; the number of passengers exceeded the maximum capacity of the vehicle; Lemus-Gonzalez evaded authorities by commencing high-speed flight; he continued to speed away from the border patrol agents after they terminated their pursuit; he was driving at a high rate of speed over railroad tracks and in and near an area highly trafficked by both vehicles and pedestrians when he lost control of his vehicle; and he undertook to transport the aliens for personal gain.  These facts are supported by ample evidence, if not undisputed.  We agree with the district court that these circumstances are beyond the recklessness involved in the ordinary intoxicated-driving offense.[11]  Accordingly, the district court did not err in applying the second-degree-murder guideline.

B

Even had the district court erred in applying the second-degree-murder guideline, any such error was harmless because the district court imposed a reasonable alternative non-Guidelines sentence.  In United States v. Bonilla, we

---

[10] Hicks, 389 F.3d at 529.

[11] See United States v. Fleming, 739 F.2d 945, 948 (4th Cir. 1984) (holding that there was sufficient evidence to support a jury's finding of malice where the defendant collided head-on with another car while driving drunk and fleeing from police).

held that the district court mistakenly applied a sixteen-level crime-of-violence enhancement but affirmed the sentence nonetheless because the district court imposed a reasonable alternative non-Guidelines sentence.[12]  In United States v. Duhon, we stated that "a non-Guideline sentence does not result from the district court's miscalculation of the Guideline range if the district court: (1) contemplated the correct Guideline range in its analysis and (2) stated that it would have imposed the same sentence even if that range applied."[13]  In Duhon, the district court erroneously failed to apply enhancements to the defendant's sentence based on its incorrect belief that it could enhance the defendant's sentence based only on facts that he had admitted.[14]  Though the Government objected to this miscalculation, the district court "made clear that it would have so sentenced Duhon even if it erred by refusing to apply all the enhancements recommended by the PSR."[15]  We concluded the sentence imposed was reasonable and affirmed.

Here, similar to the proceedings in Bonilla and Duhon, the district court stated that, even if its application of the second-degree-murder cross reference was erroneous, it would have imposed the same sentence.  The parties presented to the district court at least three alternative calculations of a Guidelines range without an enhancement for second-degree murder, all resulting in sentencing ranges lower than that which the district court found to be applicable.  The court

---

[12] United States v. Bonilla, 524 F.3d 647, 656-57 (5th Cir. 2008).

[13] 541 F.3d 391, 396 (5th Cir. 2008).

[14] Id.

[15] Id. at 395.

nevertheless concluded that the non-Guidelines sentence it chose was reasonable after considering the factors in 18 U.S.C. § 3553(a).

Lemus-Gonzalez argues that the following statement by the district court demonstrates that the court did not consider an advisory Guidelines imprisonment range of 78 to 97 months: "[I]f I looked at it just as alien smuggling without the cross reference, . . . I do not think under any circumstances of this case that a sentence of even 78 months would be reasonable. I think it would be extremely low." However, viewed in its entirety, the record reflects that the district court considered all the possible ranges that the parties urged might apply and chose a sentence based on the facts of this case and the § 3553(a) factors.

Lemus-Gonzalez contends for the first time on appeal that the district court was required to explain why a sentence of 360 months was "sufficient, but not greater than necessary."[16] We review for plain error since this complaint was not presented to the district court. The Supreme Court has explained that in providing reasons for imposing a sentence, "[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority."[17]

The district court thoroughly discussed the 18 U.S.C. § 3553(a) factors and recounted the facts discussed above, in addition to Lemus-Gonzalez's prior DWI convictions, the gruesome nature of the accident, the impact on the victims, and the need to promote respect for the law. Moreover, the court stated: "[I]n the

---

[16] 18 U.S.C. § 3553(a).

[17] Rita v. United States, 127 S. Ct. 2456, 2468 (2007).

event that I have missed something, I do adopt the [G]overnment's argument as far as both the [G]uideline[s] calculation and the arguments made pertaining to a non[-G]uideline[s] sentence." The district court demonstrated a "reasoned basis for exercising [her] own legal decisionmaking authority."[18]

Finally, Lemus-Gonzalez argues that because the Guidelines that establish the base offense levels for murder are not among those based on empirical data and national experience, less deference is due to a sentencing range derived from these sections of the Guidelines. In Kimbrough v. United States, the Supreme Court approved of a downward departure from the crack cocaine guidelines, noting that, because the guidelines for crack cocaine were not based on empirical data and national experience, "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case."[19] In the present case the district court applied its own experience, heard the parties' arguments as to the various sentencing ranges that might be applicable, and in the final analysis, applied the factors in § 3553(a) to the facts in this case in choosing an appropriate sentence. We cannot say the court abused its considerable discretion in this regard or that the sentence chosen was unreasonable.

## III

Lemus-Gonzalez contends that his sentence was imposed in violation of the Sixth Amendment, arguing that the district court improperly made factual

---

[18] Id.

[19] 128 S. Ct. 558, 575 (2007).

findings that served as the essential legal predicate for his sentence. We review Lemus-Gonzalez's constitutional claim de novo.[20]

The Sixth Amendment requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[21] The sentencing judge's finding of malice did not increase Lemus-Gonzalez's sentence above the statutory maximum. Lemus-Gonzalez pleaded guilty to eight counts of transporting aliens resulting in the death of five people in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), (B)(iv), and 18 U.S.C. § 2. Because the Government did not seek the death penalty, the statutory maximum for these convictions is life imprisonment,[22] and Lemus-Gonzalez's 360-month sentence was below that maximum.

Nor is this a case where, but for the finding of fact at issue, the sentence would have been unreasonable. Lemus-Gonzalez argues that Justice Scalia's concurrences in Rita v. United States[23] and Gall v. United States[24] left open as-applied Sixth Amendment challenges to sentences in cases in which a judge-found sentencing fact made an otherwise-unreasonable sentence reasonable. As already discussed, the district court's non-Guidelines sentence was reasonable even absent the finding of malice. Accordingly, the district court's sentence did not violate the Sixth Amendment.

---

[20] United States v. Romero-Cruz, 201 F.3d 374, 377 (5th Cir. 2000).

[21] Apprendi v. New Jersey, 530 U.S. 466, 490 (2000).

[22] See 8 U.S.C. § 1324(a)(1)(B)(iv).

[23] 127 S. Ct. 2456 (2007).

[24] 128 S. Ct. 586 (2007).

*          *          *

AFFIRMED.