# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 18-40375

United States Court of Appeals
Fifth Circuit

**FILED**
July 11, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff - Appellee

v.

JUAN ENRIQUE ESCOBEDO-MORENO,

      Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:17-CR-677-1

Before KING, ELROD, and ENGELHARDT, Circuit Judges.

PER CURIAM:*

United States Border Patrol agents stopped defendant Juan Escobedo-Moreno at a checkpoint near the Mexican–American border. They discovered an undocumented alien hiding in a closet in the cab of the tractor-trailer Escobedo-Moreno was driving. The agents apprehended and questioned Escobedo-Moreno. But Escobedo-Moreno failed to tell them that a second alien, Martin Gomez-Arellano, was hiding in a suitcase-sized compartment in the tractor. Agents discovered Gomez-Arellano's body three days later.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-40375

Escobedo-Moreno pleaded guilty to transporting an undocumented alien while placing a life in jeopardy. The district court sentenced Escobedo-Moreno to 210 months of imprisonment, largely because it determined his role in Gomez-Arellano's death amounted to second-degree murder. On appeal, Escobedo-Moreno argues that this enhancement was inappropriate because his conduct amounted only to involuntary manslaughter. We AFFIRM.

## I.

Juan Escobedo-Moreno, a commercial truck driver, agreed to transport Martin Gomez-Arellano and Roberto Rico-Duran, both undocumented aliens, from Edinburg, Texas, to Houston. Escobedo-Moreno met the two men at a warehouse while he was picking up watermelons to deliver to Houston. He instructed the men to sit on the bed in the cab of the tractor, and he showed them where to hide when they approached a United Stated Border Patrol checkpoint. He told Rico-Duran to hide in a closet and told Gomez-Arellano to hide in a 30 by 26 by 16–inch compartment underneath the bed. Escobedo-Moreno had Gomez-Arellano test the compartment to see if he would fit. Gomez-Arellano had difficulty closing the lid, so Escobedo-Moreno told him to pull hard on the lid when the time came. About 20 minutes after leaving the warehouse, they approached a Border Patrol checkpoint, and Escobedo-Moreno told Gomez-Arellano and Rico-Duran to hide and stay silent.

Border Patrol agents at the checkpoint asked Escobedo-Moreno if they could search the truck. Escobedo-Moreno consented. The agents found Rico-Duran in the closet, but they did not discover Gomez-Arellano in the compartment under the bed.

The agents arrested Escobedo-Moreno and Rico-Duran, and seized the truck. Escobedo-Moreno gave a statement, in which he said a man whom he knew only as "Jose" asked him to transport Rico-Duran to Houston for $2,500. He recounted the details of how he met Rico-Duran at the warehouse while he

was loading the watermelons into the truck and instructed Rico-Duran to hide in the closet when they approached the Border Patrol checkpoint. He made no mention of Gomez-Arellano, and the agents did not ask if anyone else was in the truck.

Three days later, Border Patrol agents discovered a foul odor coming from the truck. Upon further inspection, they noticed that there was human waste dripping from the tractor's rear passenger side and that the cab was filled with flies. The agents searched the cab again, and this time they discovered Gomez-Arellano's decomposing body in the compartment beneath the bed. An autopsy revealed that Gomez-Arellano died of asphyxiation from suffocation, with positional asphyxiation as a potential contributing factor. The high temperature reached 90 degrees Fahrenheit between the time Escobedo-Moreno was detained and the time the Border Patrol agents discovered Gomez-Arellano's body.

The compartment was divided into multiple sections. The section in which Gomez-Arellano was found had no holes to allow air in. One of the sections had a small side door to allow access to equipment stored in the compartment from outside the tractor. But Gomez-Arellano would not have been able to access the door from the section he was hiding in. Agents also found a cellphone in the compartment, but it was in a different section than Gomez-Arellano, which he also could not access.

Escobedo-Moreno pleaded guilty to transporting Gomez-Arellano while placing his life in danger. *See* 8 U.S.C. § 1324(a)(1)(A)(ii), (A)(v)(II), (B)(iii). The U.S. Sentencing Guidelines (the "Guidelines") provision for transporting an unauthorized alien, § 2L1.1, instructs that if a death resulted from the crime, then the "appropriate homicide guideline" listed in § 2A1 should apply if that guideline would prescribe a greater sentence than § 2L1.1 would otherwise prescribe. U.S. Sentencing Guidelines Manual § 2L1.1(c) (U.S. Sentencing

No. 18-40375

Comm'n 2016). Cross-referencing to § 2A1.1, the U.S. Probation Department determined in Escobedo-Moreno's presentence report ("PSR") that the appropriate guideline was for first-degree murder, which carries a base offense level of 43. The PSR then enhanced his offense level by 2 because Escobedo-Moreno used a special skill in committing the offense (driving commercial vehicles),[1] *see id.* § 3B1.3, and then reduced it by 3 for accepting responsibility and assisting in his own prosecution, *see id.* § 3E1.1, arriving at a total offense level of 42. With an offense level of 42 and a criminal history category of I, the Guidelines recommend a sentence range of 360 months to life in prison. *See id.* § 5A. Because this exceeded the 240-month statutory maximum, *see* § 1324(a)(1)(B)(iii), the PSR recommended a 240-month sentence.

Escobedo-Moreno objected to the first-degree murder enhancement. He argued that he did not act with malice aforethought in causing Gomez-Arellano's death, so his conduct amounted only to involuntary manslaughter. The Government agreed that first-degree murder was not the appropriate guideline. But it argued that cross-reference to the second-degree murder guideline was appropriate because Escobedo-Moreno acted with extreme recklessness. Applying the second-degree murder enhancement instead reduced Escobedo-Moreno's total offense level to 37, resulting in a guideline range of 210 to 262 months in prison (again capped by statute at 240 months). *See* U.S.S.G. §§ 2A1.2, 5A. The district court applied the second-degree murder guideline and sentenced Escobedo-Moreno to 210 months in prison. Escobedo-Moreno appeals.

---

[1] Escobedo-Moreno objected to the special-skill enhancement below, but he does not press this issue on appeal.

4

No. 18-40375

## II.

We review the district court's application of the Guidelines de novo. *United States v. Muniz*, 803 F.3d 709, 712 (5th Cir. 2015). But we credit the district court's factual findings unless they are clearly erroneous. *Id.* The Government has the burden to prove the facts supporting a sentencing enhancement by a preponderance of the evidence. *United States v. Juarez*, 626 F.3d 246, 251 (5th Cir. 2010). The district court may draw reasonable inferences from the evidence presented, and we credit these inferences absent clear error. *Id.*

## A.

The only dispute here is whether the district court properly applied § 2A1.2, the second-degree murder guideline, under the facts of this case. Section 2A1.2 incorporates 18 U.S.C. § 1111, the federal murder statute. Drawing from common law, § 1111 defines murder as "the unlawful killing of a human being with malice aforethought." § 1111(a); *see also United States v. Browner*, 889 F.2d 549, 551 (5th Cir. 1989) ("[T]he federal homicide statutes simply adopt the language of the traditional common-law offenses of murder and manslaughter."). Under § 1111, first-degree murder is

> perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed.

§ 1111(a). Second-degree murder is "[a]ny other murder." *Id.* Second-degree murder is thus an unlawful killing with malice aforethought but without one of the aggravating circumstances enumerated in § 1111(a).

5

No. 18-40375

The critical concept of malice "bears little if any relationship to the ordinary meaning of the word." *Browner*, 889 F.2d at 551. Rather, the term refers to "at least three distinct mental states," including: "(1) intent to kill; (2) intent to do serious bodily injury; and (3) the existence of a 'depraved heart,' another term of art that refers to a level of extreme recklessness and wanton disregard for human life." *Id.* at 551-52. There is no indication that Escobedo-Moreno intended to kill or harm Gomez-Arellano. So to the extent that Escobedo-Moreno acted with malice, it is because he exhibited "extreme recklessness and wanton disregard for human life." *Id.* at 552.

An unlawful killing without malice is manslaughter. *Id.*; *see also* 18 U.S.C. § 1112. Section 1112, again following the common law, distinguishes between voluntary and involuntary manslaughter. For an involuntary manslaughter conviction, "the requisite mental state is reduced to 'gross' or 'criminal' negligence," *Browner*, 889 F.2d at 553, which we have defined as "a wanton or reckless disregard for human life." *United States v. Fesler*, 781 F.2d 384, 393 (5th Cir. 1986). Accordingly, as we have previously observed, "'extreme' conduct is the degree of differentiation between second degree murder and involuntary manslaughter." *United States v. Lemus-Gonzalez*, 563 F.3d 88, 92 (5th Cir. 2009).

The parties agree that Escobedo-Moreno acted at least recklessly when he directed Gomez-Arellano to hide in the compartment beneath the bed and then failed to inform the Border Patrol agents of Gomez-Arellano's whereabouts. The question is whether Escobedo-Moreno acted *extremely* recklessly. The answer depends in large part on what Escobedo-Moreno knew at the time. *See* 2 Wayne R. LaFave, Substantive Criminal Law § 14.4(a) (3d ed. 2018 update) ("[F]or depraved-heart murder it is not a great amount of risk in the abstract which is decisive. . . . [I]t is what the defendant should realize to be the degree of risk, in the light of the surrounding circumstances *which he*

No. 18-40375

*knows*, which is important . . . ." (emphasis added)). We thus proceed by examining the evidence presented at sentencing and the district court's factual findings that bear on Escobedo-Moreno's state of mind.

**B.**

The Government primarily relies on evidence that the compartment had a latch, which would have prevented Gomez-Arellano from opening the compartment from the inside. The latch was the subject of some dispute at sentencing. A private investigator working for the defense testified that she examined the latch and discovered it was defective. She explained that she repeatedly closed the compartment, "[a]nd it would at times not latch and then it would latch. . . . [I]t was kind of sporadic." The investigator testified that she did not try to open the container from the inside.

The Government responded that the latch was stuck shut when the agents found Gomez-Arellano so that they had to use a crow bar to open it. And it further cited Escobedo-Moreno's instruction to Gomez-Arellano to "pull hard" on the compartment's lid to close it. Defense counsel disputed at sentencing whether Escobedo-Moreno specifically told Gomez-Arellano "to 'pull hard,' so that it latches." But in response to the district court's questioning, counsel conceded that Escobedo-Moreno instructed Gomez-Arellano to "close" the compartment.

Regardless, counsel argued that there was no evidence that Escobedo-Moreno knew the compartment latched when Gomez-Arellano closed it. The district court called this assertion "beyond belief." We interpret this as a factual finding that Escobedo-Moreno knew Gomez-Arellano could not open the compartment's lid from the inside. This finding is not clearly erroneous. From Escobedo-Moreno's instruction to "pull hard" on the lid, the district court could have reasonably inferred that he knew the lid would latch.

Otherwise, the Government points to Rico-Duran's statement that Escobedo-Moreno told him and Gomez-Arellano to remain quiet as they approached the Border Patrol checkpoint. And it points to evidence that the day after they were apprehended, Rico-Duran saw Escobedo-Moreno in the federal courthouse and asked him, "What about the other guy?" Escobedo-Moreno shrugged his shoulders in response. The district court found Escobedo-Moreno's shrug to be "indicative of someone without any conscience or any regard for human life."

The district court made only one additional finding bearing on Escobedo-Moreno's state of mind. The district court concluded that Escobedo-Moreno knew at the time he gave his statement to the Border Patrol agents that the agents had not discovered Gomez-Arellano. We credit this finding as well; in interviewing Escobedo-Moreno, the agents asked only about Rico-Duran. The district court made no findings about whether Escobedo-Moreno knew that Gomez-Arellano could not access the compartment's side door or the cellphone despite defense counsel's argument that the Government had not proved these facts.

In sum, the evidence and the district court's reasonable inferences show that Escobedo-Moreno knew Gomez-Arellano could not open the compartment lid from the inside. Escobedo-Moreno further knew that by the time he gave his statement to the Border Patrol agents, they had not discovered Gomez-Arellano. But it is unclear whether Escobedo-Moreno knew Gomez-Arellano could not escape through the side door. And it is unclear whether Escobedo-Moreno knew Gomez-Arellano could not call for help on the cellphone in the compartment.

## C.

We conclude that this evidence supports the second-degree murder enhancement. Escobedo-Moreno argues that even if he knew Gomez-Arellano

could not escape through the compartment's lid, there is no evidence he knew Gomez-Arellano could not escape through the side door or by calling for help on the cellphone. Indeed, he says, Rico-Duran told investigators that he thought Gomez-Arellano might have escaped through the side door or called for help. The Government presented no evidence that Escobedo-Moreno did not hold a similar belief. We thus accept the possibility that Escobedo-Moreno believed Gomez-Arellano might have escaped through the side door or by calling for help on the cellphone.

Regardless, the facts within Escobedo-Moreno's knowledge should have led him to realize there was also a substantial possibility that Gomez-Arellano would not be able to escape. Escobedo-Moreno knew that Gomez-Arellano barely fit in the compartment in the first place. From this, he should have understood that it was unlikely that Gomez-Arellano would have enough room to contort his body as needed to access and open the side door. And he should have appreciated the similar risk that even if Gomez-Arellano and the cellphone were in the same section of the compartment, Gomez-Arellano would not be able to move enough to grasp and manipulate the cellphone as needed to make a call or send a message.

We agree with the Government that Escobedo-Moreno's conduct—when weighed against the facts as he understood them—was at least as reckless as the conduct we held to be extremely reckless in *Lemus-Gonzalez*. That case involved a smuggler's drunken high-speed flight from authorities while driving a van overloaded with unsecured passengers. *See Lemus-Gonzalez*, 563 F.3d at 90-91. The episode predictably ended in a fatal crash. *See id.* We concluded that the defendant's conduct rose to extreme recklessness, so we upheld the district court's cross-reference to the second-degree murder guideline. *See id.* at 93.

9

Escobedo-Moreno insists that *Lemus-Gonzalez* is an inapt comparison because, unlike the defendant in that case, he did not make a "series of choices" in bringing about Gomez-Arellano's death. This argument falls on both its major and minor premises. First, our caselaw does not require a defendant to make a "series of choices" to act with extreme recklessness. On the contrary, we have upheld a second-degree murder enhancement for a defendant who fired a gun at an occupied police car—a single choice. *See United States v. Hicks*, 389 F.3d 514, 530 (5th Cir. 2004). The proper inquiry is the "degree of risk" involved, LaFave, *supra*, at § 14.4(a), and the risk that Gomez-Arellano would not escape the compartment seems at least as great as the risk that the defendant in *Lemus-Gonzalez* would crash the van. But even assuming the better inquiry is the number of choices the defendant made in bringing about that risk, Escobedo-Moreno ignores that he had more than one opportunity to tell someone about Gomez-Arellano. Yet for three days he declined to do so at every turn. All the while, the risk became more pressing that Gomez-Arellano would perish in the tractor, which was powered down and sitting in the South Texas heat.

Accordingly, even if Escobedo-Moreno believed there was some possibility Gomez-Arellano could escape, the risk to Gomez-Arellano's life under the facts as Escobedo-Moreno understood them was so grave that Escobedo-Moreno's conduct crossed the extreme-recklessness threshold. We therefore conclude that the district court properly applied the enhancement for second-degree murder.

## III.

We AFFIRM the district court's judgment.